# United States Court of Appeals
## For the First Circuit

No. 06-1520

UNITED STATES OF AMERICA,

Appellee,

v.

MANUEL PACHECO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
and Lynch, Circuit Judge.

James H. Budreau on brief for appellant.
Michael J. Sullivan, United States Attorney, and David Hennessy, Assistant United States Attorney, on brief for appellee.

May 31, 2007

**SELYA**, **Senior Circuit Judge**. Defendant-appellant Manuel Pacheco pleaded guilty to a count that charged, in effect, that he conspired to distribute controlled substances. See 21 U.S.C. §§ 841(a)(1), 846. In imposing a 36-month sentence, the district court departed upward from the guideline sentencing range (GSR) pursuant to USSG §5K2.2, which authorizes a departure in the event that significant physical injury has resulted from the offense conduct. The defendant appeals. Discerning no error, we affirm.

## I. BACKGROUND

Because this appeal follows a guilty plea, we take the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report, the victim's hospital records (submitted by the defendant to the district court), and the transcript of the disposition hearing. See United States v. Mateo-Espejo, 426 F.3d 508, 509 (1st Cir. 2005); United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991). All enumerated events occurred in 2001, unless otherwise indicated.

On July 27, a Massachusetts college student, MG, was found by his mother in a barely responsive state. Close by were two bottles of ketamine, some empty vials, and some hypodermic syringes. MG's mother also discovered an empty priority-mail envelope, apparently sent by one D.O.C. on June 19. The envelope bore a return address in Reseda, California, and MG's mother reasonably concluded that the ketamine had arrived in it.

-2-

Emergency medical personnel transported MG to a nearby hospital. Physicians admitted him to intensive care and provisionally diagnosed a ketamine overdose. MG later informed hospital staff that he had taken heroin approximately one hour before he ingested 200 milligrams of ketamine (twice his usual self-administered dose). Subsequent diagnoses reflected MG's ingestion of both drugs. After a few days, MG left the hospital, contrary to medical advice. The defendant does not dispute that MG's physical injuries were significant.

In the ensuing investigation, the authorities learned that the defendant, under the nom de guerre "the Doc," advertised various substances for sale over the internet. They also learned that, between May and July, MG had ordered ketamine from the defendant approximately ten times. Most of the orders were for five bottles, although at least one order specified twice that number of bottles. Each bottle contained ten milliliters of ketamine.[1]

The defendant filled these orders with shipments to a mailbox that MG had rented for the express purpose of obtaining the contraband. A search of the mailbox revealed an unopened package from D.O.C., which had been sent on July 26. That package

---

[1]The record is sparse as to the relationship between milliliters and milligrams of ketamine.

contained five bottles of ketamine and an invoice listing MG's e-mail address.

With this background information in hand, federal authorities began to probe more deeply into the defendant's activities. In and after August, they intercepted three incoming mailers addressed to D.O.C. at a mailbox rented by the defendant near his Reseda residence. Each envelope contained cash or a money order. The agents also intercepted a number of outgoing shipments (i.e., shipments from the Reseda address listed as the return address on the June 19 priority-mail envelope that had been sent to MG)[2] containing steroids of various types.

On October 12, federal agents armed with a warrant searched the defendant's Reseda residence as well as a Mercury Sable parked in the driveway. The search yielded a price list from a store in Mexico for, among other things, ketamine. The search also turned up approximately fifty-five boxes of steroids, packaging materials, priority-mail envelopes and labels, and a loaded revolver.

The agents proceeded to interview the defendant. He took responsibility for the mailings, thus admitting use of the pseudonyms "D.O.C." and "the Doc." However, he professed that his main business was the distribution of body-building substances. He

_____

[2]This address belonged to a neighbor who permitted the defendant to use it for correspondence.

claimed that he had stopped distributing ketamine — a horse tranquillizer that no one presently asserts is a body-building substance — after hearing that people were using it to get high.

On November 6, customs agents stopped the Mercury Sable on a return trip from Mexico. A vehicle search revealed 1,300 units of steroids. The car's occupants (residents of the "rear house" at the defendant's Reseda address) told the agents that the steroids were destined for delivery to the defendant.

After a federal grand jury in the District of Massachusetts returned a six-count indictment against him, the defendant pleaded guilty to the lead count, which charged conspiracy to distribute and to possess with intent to distribute ketamine and anabolic steroids. At a sentencing hearing held on August 18, 2005, the district court, without demurrer from either side, arrived at a GSR of 18-24 months. On the government's motion and over the defendant's objection, the court then invoked USSG §5K2.2 and departed upward on the ground that the defendant's actions had resulted in significant injuries to MG (who did not testify at the disposition hearing). Accordingly, the court imposed a 36-month incarcerative sentence. This timely appeal followed.

## II. DISCUSSION

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court revolutionized federal sentencing practices. In the

post-Booker world, a sentencing court must follow a four-step progression. The court's task begins with calculating the applicable GSR. It next must decide whether any departures are in order. Then, the court must ponder the factors set forth in 18 U.S.C. § 3553(a), as well as any other relevant information. Finally, the court must determine what sentence (whether within, above, or below the GSR) is appropriate in the particular case. See United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006); United States v. Jiménez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007). We emphasize that these four steps are not mechanical; as long as the sentencing court touches all of the relevant bases and explains what it has done, it may combine steps or vary the order.

In the case at bar, the defendant trains his fire on the second step of the above-described sentencing pavane: the lower court's decision to effect an upward departure. We turn, then, to that decision.

The departure provision relied upon by the sentencing court allows for an upward departure "[i]f significant physical injury resulted" from the offense conduct. USSG §5K2.2. The guideline further provides:

> The extent of the increase ordinarily should depend on the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked. When the victim suffers a major, permanent disability and when such

> injury was intentionally inflicted, a
> substantial departure may be appropriate. If
> the injury is less serious or if the defendant
> (though criminally negligent) did not
> knowingly create the risk of harm, a less
> substantial departure would be indicated.

Id.

The defendant assigns error to the district court's application of this guideline. In his view, the evidence was insufficient to prove that MG's significant physical injuries resulted from ketamine that he furnished.

This line of argument has two branches. First, the defendant claims that MG had other suppliers, so the defendant was not necessarily responsible for selling him the ketamine that contributed to the near-fatal overdose. Second, the defendant claims that, in all events, the ingestion of heroin broke the chain of causation. We examine these claims separately. We start, however, with the standard of review.

### A. Standard of Review.

Under an advisory guidelines regime, we review the ultimate sentence for reasonableness. Booker, 543 U.S. at 261-62. Nevertheless, the underlying guideline computations must be legally correct. United States v. Gobbi, 471 F.3d 302, 313 & n.7 (1st Cir. 2006). That brings other standards of review into the equation.

We review de novo claims that a sentencing court committed an error of law in interpreting or applying the guidelines. United States v. Pho, 433 F.3d 53, 60-61 (1st Cir.

2006). Conversely, we review a sentencing court's factual findings, including the findings that undergird departure determinations, for clear error.[3] United States v. Wallace, 461 F.3d 15, 33 (1st Cir. 2006).

## B. Ketamine Origination.

The defendant admits to supplying MG with ketamine in the spring of 2001. He argues, however, that even if the injuries MG sustained can be attributed to a ketamine overdose, the evidence is too thin to prove that he — and not some other source — supplied the harm-inducing ketamine. He attempts to bolster this argument in two ways. First, he characterizes MG as a habitual user of ketamine whose daily intake — sometimes as much as 100 milligrams, five times a day — substantially exceeded the quantities furnished to him by the defendant. Second, he emphasizes the span of time between the date of the last shipment that MG actually received from him (June 19) and the date of the overdose (July 27). As he sees it, that five and one-half week hiatus calls into serious question the theory that he was the supplier of the near-fatal dose of ketamine.

---

[3]This appeal does not require us to decide whether a district court's ultimate decision to depart engenders separate review for abuse of discretion, see, e.g., United States v. Fuller, 426 F.3d 556, 562 (2d Cir. 2005), or engenders review for reasonableness as part of the overall Booker analysis, see Booker, 543 U.S. at 261-62. Here, the defendant advances a series of specific fact-based and law-based challenges. He does not argue — nor could he, on this record — that if those challenges fail, the upward departure was nonetheless an abuse of discretion or otherwise unreasonable.

Although cleverly contrived, this argument will not wash. In determining whether the government has carried the devoir of persuasion at sentencing, the district court must employ a preponderance of the evidence standard. See, e.g., United States v. Leahy, 473 F.3d 401, 413 (1st Cir. 2007); United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005). The record adequately evinces that the government carried its burden here.

The evidence before the district court concerning MG's rate and frequency of ketamine consumption was not mathematically precise. But the evidence did reflect that MG was discovered with two bottles of ketamine and related paraphernalia by his side. A priority-mail envelope, reasonably believed to have been the vehicle for delivery of the two bottles, was directly traceable to the defendant. When the authorities searched the mailbox that MG had rented for the avowed purpose of receiving ketamine shipments and to which the earlier priority-mail envelope had been addressed, they discovered another ketamine-laden envelope directly traceable to the defendant. While there was a lag of roughly five and one-half weeks between the defendant's last pre-overdose shipment and the date of the overdose, two things are clear. First, the fact that the defendant's envelope was found at the scene is telling. Second, the fact that another batch of ketamine was waiting, unclaimed, could well confirm, rather than undermine, that the defendant was the likely source of the ketamine ingested by MG.

To be sure, it is possible that MG had other sources of ketamine available to him. But the record contains no proof of that conjecture. More importantly, we believe that in light of the chronology limned above, the district court's finding that the defendant was the source of the harm-inducing ketamine is supportable. After all, a district court's choice among plausible but conflicting inferences cannot be clearly erroneous. See, e.g., United States v. Miliano, 480 F.3d 605, 608 n.2 (1st Cir. 2007); United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

### C. **Ketamine Causation**.

The defendant next contends that regardless of who supplied the ketamine that MG ingested on July 27, the evidence is insufficient to sustain a finding that ketamine caused MG's injuries. This contention rests on two alternate hypotheses: first, that the medical evidence failed to prove that MG's injuries resulted from ketamine rather than heroin; and second, that MG's use of heroin severed any ketamine-linked chain of causation. We consider these hypotheses in turn.

1. **Medical Evidence**. At sentencing, the district court had before it the records of MG's hospitalization. Those records include references to both ketamine and heroin. The defendant posits that the government should not have relied on the unembellished hospital records but, rather, should have presented medical testimony to distill the harms caused by each substance.

-10-

Cf. United States v. Carbajal, 290 F.3d 277, 286 (5th Cir. 2002) (discussing testimony of government's medical expert, offered at sentencing for a similar purpose).

Whatever help such an expert might have provided here, this argument is forfeit. In the district court, the parties argued the propriety of a section 5K2.2 departure solely in terms of the hospital records. At no point did the defendant so much as hint at the possible utility of an expert witness, nor did he suggest that the government needed to present extrinsic expert opinion testimony in order to show causation. Accordingly, the argument is forfeited. See Teamsters, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."); see also United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) (applying this principle in a criminal case).

Notwithstanding this forfeiture, plain error review remains available. See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). But that is cold comfort to the defendant. Because there is no obvious error here, that potential escape hatch remains firmly shut. See id.

In a variation on this theme, the defendant asseverates that an upward departure under section 5K2.2 was precluded because

-11-

the hospital records and other evidence did not prove that ketamine rather than heroin (which the defendant did not supply) caused MG's injuries. In support of this asseveration, the defendant points out that MG used ketamine on a daily basis without apparent incident; that a comment in the hospital chart states that "[k]etamine abuse, common in adolescents/young adults[,] is very well tolerated [and] rarely results in [emergency department] visits"; and that these and other facts indicate that MG's injuries were more likely caused by heroin than by ketamine. This proposition lacks persuasive force.

As said, section 5K2.2 authorizes a departure "[i]f significant physical injury resulted" from the offense conduct. Although we have not had occasion to construe the applicability of this guideline in circumstances in which more than one harmful substance was found in a victim's system, our case law construing a related guideline — USSG §5K2.1 — is quite helpful. That guideline authorizes an upward departure "[i]f death resulted" from the offense conduct. USSG §5K2.1. It is readily evident that section 5K2.1 and section 5K2.2 are sisters under the skin; the two are designed to accomplish much the same purpose and are phrased in a very similar manner. Moreover, the latter guideline specifically cross-references the former. See id. §5K2.2 (stating that "[i]n general, the same considerations apply as in §5K2.1"). We are

confident, therefore, that precedent under section 5K2.1 is of great utility in construing section 5K2.2.

We have construed section 5K2.1 to allow a departure when "a defendant puts into motion a chain of events" that runs a cognizable risk of death, even though "the defendant was not directly responsible for the death." United States v. Diaz, 285 F.3d 92, 101 (1st Cir. 2002). Thus, a departure under that guideline is permitted "even when the defendant is not the direct cause of the victim's death." United States v. Sanchez, 354 F.3d 70, 80-81 (1st Cir. 2004). We cite these cases as examples; they do not suggest limitations on the principle of but-for causation.

Applying these tenets, we conclude that to warrant an upward departure in this case, the government was not required to show that ketamine was either the sole or the direct cause of MG's injuries; it had to show only that there was a but-for causal connection between ketamine and those injuries.

The evidence before the district court easily met this benchmark. The hospital records are replete with references to MG's use of ketamine and his "ketamine overdose." Although other notations mention MG's ingestion of heroin, the records as a whole support an inference that ketamine was at least a concurrent cause of the injuries. Indeed, at the disposition hearing, defense counsel expostulated that the hospital records indicated an "overdose on July 27th of 200 milligrams of ketamine, plus heroin."

The ultimate diagnosis — a "[h]eroin/ketamine overdose" — reflects this reality.

The chronology of events supports the view that MG's injuries were causally connected to his use of ketamine. The evidence shows that MG ingested ketamine approximately one hour after he took heroin; thus, the heroin by itself had not rendered him unconscious. To cinch matters, the amount of ketamine that MG consumed (200 milligrams) constituted twice his usual dosage.

To sum up, the totality of the evidence was sufficient to ground an inference that ketamine, either by itself or in combination with heroin, played a meaningful role in the overdose (and, thus, in the incidence of the injuries). It follows inexorably, from all that we have said thus far, that the district court did not commit clear error in finding that significant physical injury resulted from ketamine supplied by the defendant. An upward departure pursuant to USSG §5K2.2 was, therefore, appropriate.

**2. Intervening Cause**. The defendant has another shot in his sling. While acknowledging that "intent and foreseeability are not prerequisites" to an upward departure under section 5K2.2, he argues that intentional acts undertaken by MG broke the chain of causation here. In particular, he alludes to MG's mixing of heroin

with ketamine despite knowing the dangers of such an amalgam and his "clear attempt" to commit suicide.[4]

The defendant's concession that foreseeability is not a requirement for an upward departure under section 5K2.2 is well-taken. To cite but one example, apposite here, an upward departure may be appropriate under section 5K2.2 with respect to a defendant who, although not directly responsible for a significant physical injury and although not harboring an intent to harm, sets into motion a chain of events that risks serious harm to others. See United States v. Scheetz, 293 F.3d 175, 191 (4th Cir. 2002). There is no foreseeability requirement per se.

This conclusion is consistent with our precedent applying 21 U.S.C. § 841(b)(1)(C), which requires an enhanced sentence for a defendant who commits a drug offense "if death or serious bodily injury results from the use of such substance." We have construed this statute, the language of which is reminiscent of the language of sections 5K2.1 and 5K2.2, to require no more than that "a defendant deals drugs and a user of those drugs dies as a result." United States v. Soler, 275 F.3d 146, 153 (1st Cir. 2002); accord United States v. Wall, 349 F.3d 18, 24-25 (1st Cir. 2003). The

_____

[4]Despite this hyperbole, it is far from clear that MG attempted to commit suicide. Although he admitted to hospital staff that he had had suicidal ideations in the past and that he knew the potential dangers of mixing ketamine with heroin, the record is inconclusive about whether or not he set out to commit suicide. This appeal does not require us to resolve that uncertainty.

same paradigm applies under section 841(b)(1)(C) where serious bodily injury results. See, e.g., United States v. Robinson, 167 F.3d 824, 831-32 (3d Cir. 1999). The statutory enhancement, as we have construed it, is a matter of "strict liability." Soler, 275 F.3d at 152.

Viewed against this backdrop, we do not think that MG's actions precluded an upward departure here. The defendant's attempt to package this as an "intervening cause" argument is a misnomer. Since section 5K2.2 does not specify a foreseeability requirement, our earlier holding that ketamine was a but-for cause of the significant physical injuries sustained by MG, see supra Part II(C)(1), fully disposes of any argument that MG's actions severed the ketamine-linked chain of causation.[5]

We add an eschatocol of sorts. To the extent that a defendant's intent has a role to play in the section 5K2.2 departure calculus, that role relates to the extent of the departure imposed. See USSG §5K2.2 (providing that the length of the departure should be tied, in part, to "the extent to which the injury was intended or knowingly risked"); cf. Diaz, 285 F.3d at

---

[5]We add, in passing, that the defendant here engaged in the commercial trade of potent substances that he must have known could have dire consequences in a myriad of circumstances. That his business practices were geared to evade detection reflects an awareness of those risks. Consequently, while he could not have anticipated the exact sequence of events that unfolded here, he could (and should) have foreseen the possibility of the kind of serious harm that in fact occurred.

101 (stating, in connection with section 5K2.1, that "[a]meliorating factors" would bear on the extent of departure). In this appeal, the extent of the departure has not been challenged by the defendant.[6]

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we conclude that the evidence was sufficient to support an upward departure under USSG §5K2.2, and that the sentencing court acted appropriately in applying the guideline.

**Affirmed**.

---

[6]It perhaps bears mentioning that the district court did not depart upwardly to the full extent requested by the government but, rather, took into account on the degree of the departure the lack of any specific intent and the peculiar nature of the events.