# United States Court of Appeals
## For the First Circuit

No. 15-1602

UNITED STATES OF AMERICA,

Appellee,

v.

DARREN STOKES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

James B. Krasnoo, with whom Krasnoo, Klehm & Falkner LLP was on brief, for appellant.
Mark J. Balthazard, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, and Doreen M. Rachal, Assistant United States Attorney, were on brief, for appellee.

July 13, 2016

**TORRUELLA**, **Circuit Judge**.  From 2008 to 2012, defendant-appellant Darren Stokes sent fraudulent invoices to thousands of businesses.  Each invoice appeared to be sent by a legitimate trade association and directed the business to send membership dues to one of three addresses in Massachusetts where, unbeknownst to the business, Stokes received mail.  Postal inspectors intercepted mailings to these addresses.  After criminal charges were leveled against Stokes in the United States District Court for the District of Massachusetts, he moved to suppress the mailings as the product of an unreasonable search under the Fourth Amendment.  The district court denied the motion to suppress, and Stokes pled guilty to 8 counts of wire fraud under 18 U.S.C. § 1343 and 7 counts of mail fraud under 18 U.S.C. § 1341.  During the sentencing, the district court determined that Stokes's scheme had an intended loss between $400,000 and $1,000,000 and 250 or more victims, findings that increased his sentencing range under the United States Sentencing Guidelines, and sentenced Stokes to 48 months' imprisonment.  Stokes reserved the right to appeal the district court's denial of his motion to suppress and its sentencing determination; he appeals those decisions here.  We affirm.

**I.**

"Because this appeal follows a guilty plea, we draw the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing." United States v. Mateo-Espejo, 426 F.3d 508, 509 (1st Cir. 2005). Where necessary, we supplement the facts with materials submitted to the district court for purposes of the motion to suppress. See United States v. Pacheco, 489 F.3d 40, 42 (1st Cir. 2007).

From 2008 to 2012, Stokes sent fraudulent invoices to businesses. The invoices purported to be from legitimate trade associations, including the American Dental Association (the "ADA"), the National Association of Manufacturers (the "NAM"), the American Trucking Association (the "ATA"), and the American Hospital Association (the "AHA"). Each invoice requested that the recipient send annual membership dues to the trade association at a Massachusetts address where Stokes received mail. Stokes was listed as neither a recipient nor a sender on any of these mailings.

Stokes identified target businesses by purchasing lists of business fax numbers and then hiring a company, Profax, to send invoices to those numbers. For example, in January 2012, Stokes used Profax to send invoices purporting to come from the ADA and

requesting $575 in membership dues to more than 13,000 dental offices. That same month, Stokes had Profax send invoices bearing the NAM[1] acronym and requesting $575 in membership dues to 1,100 manufacturing businesses. He cashed the checks using United Check Cashing, a business where customers could cash checks instantly without needing to establish a bank account.

From 2008 onward, Stokes received cease and desist letters from various trade associations and faced two civil actions, as well as an administrative complaint from the United States Postal Inspection Service, for his involvement in this scheme. In 2012, postal inspectors seized 443 envelopes addressed to the ADA that were mailed to a P.O. Box in Brockton, Massachusetts, in response to Stokes's fraudulent invoices. The PSI assumed that each of these envelopes contained a check for $575. Postal inspectors withheld from delivery 32 envelopes assumed to contain checks for $575 addressed to the NAM at a Willard Street address in Quincy, Massachusetts, 10 envelopes assumed to contain checks for $585 addressed to the Automotive Parts Remanufacturers Association (the "APRA") at a Blaine Street address in Brockton, and 14 envelopes assumed to contain checks

---

[1] Despite containing the NAM acronym, the invoices used the name "National Manufacturers Association," as opposed to the National Association of Manufacturers.

for $685 addressed to the ATA at the same Blaine Street address. At oral argument, the Government explained that it had sought the consent of the senders to open 7 of these items and that those 7 opened envelopes[2] formed the basis of mail fraud counts. Although postal inspectors seized 8 envelopes personally addressed to Stokes at his P.O. Box, the Government avows that they were never opened.

Stokes was charged with 8 counts of wire fraud under 18 U.S.C. § 1343, based on calls that Stokes made to Profax in January and February 2012, and 7 counts of mail fraud under 18 U.S.C. § 1341. He sought to suppress the seized mail before the district court. The district court denied the motion in a written memorandum and order, explaining that "no mail addressed to Stokes personally ha[d] ever been opened" and that he lacked "standing to challenge the seizure of letters addressed to someone else altogether." Stokes pled guilty, reserving the right to appeal the suppression issue.

At the sentencing hearing, the district court adopted the probation office's recommendation for a base offense level of

---

[2] The 7 opened items included: 3 envelopes addressed to the ADA containing checks for $575; an envelope addressed to the NAM containing a check for $575; 2 envelopes addressed to the APRA containing checks for $585; and an envelope addressed to the ATA containing a check for $685.

7, with a 14-level increase for an intended loss between $400,000 and $1,000,000,[3] a 6-level increase for 250 or more victims, and a 2-level decrease for acceptance of responsibility. With a total offense level of 25 and a Criminal History Category of III, Stokes had a sentencing range of 70 to 87 months' imprisonment. Stokes received a below-guidelines sentence of 48 months' imprisonment and 3 years' supervised release.[4]

Stokes now appeals the denial of his motion to suppress and the district court's loss calculation.

## II.

### A.  Unreasonable Search and Seizure

For suppression issues, "we review a district court's factual findings for clear error," with "[t]he ultimate conclusion as to whether there is a Fourth Amendment violation" subject to de novo review. United States v. Weidul, 325 F.3d 50, 51 (1st Cir. 2003).

Stokes argues that the search and seizure of his mail constituted a violation of the Fourth Amendment as his mail was

---

[3]  Originally, the PSI recommended a 20-level increase based on an intended loss between $7,000,000 and $20,000,000. After receiving objections from both the Government and Stokes, the Probation Office revised this figure.

[4]  Stokes was also ordered to pay a special assessment of $1,500 and restitution of $1,170.

opened without a warrant and in violation of postal regulations, statutes, and a court order in a related civil case.[5]  The district court did not reach these issues as Stokes failed to make a threshold showing that he has a reasonable expectation of privacy in the searched mail.  We too find that Stokes's inability to

[5]  In January 2012, the ADA filed a civil suit in the United States District Court for the District of Massachusetts seeking a preliminary injunction against Stokes.  Following a hearing, the district court granted the ADA's proposed preliminary injunction, which authorized the United States Postal Service (the "USPS") to seize and withhold documents addressed to Stokes's P.O. Box.  The proposed order provided that the USPS "shall attempt to obtain permission from the senders to open and provide to Plaintiff's counsel, for inspection and copying, the seized documents."  Before entering the order, however, the district court crossed out this language.  Stokes contends that the district court's actions indicate that it was forbidding the USPS from opening mail, even with the sender's consent.  While we need not decide this issue, we agree with the Government that the more plausible reading is that the district court was not requiring the USPS to contact the sender or provide the ADA's counsel with copies of the seized documents.  Had the district court wanted to forbid the USPS from contacting the sender, it could have simply added "not" to the sentence.

Stokes also alleges violations of 39 C.F.R. § 233.1(b), which imposes limitations on postal inspectors' investigative powers, and 39 U.S.C. § 404(c), which provides that the USPS may open mail only "under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee."  The Government contends that the USPS is authorized to investigate these matters and open mail with the sender's consent under 39 U.S.C. § 3003(a) and section 274.21 of the USPS Administrative Support Manual.  Because we find that Stokes lacks standing to challenge the searches here, we do not address this dispute.

demonstrate a reasonable expectation of privacy in the items searched and seized is fatal to his claim.[6]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy." Rakas v. Illinois, 439 U.S. 128, 143 (1978). Under what is known as the "standing" doctrine,[7] the defendant carries the burden of making a threshold showing that he has "a reasonable expectation of privacy in the area searched and in relation to the items seized." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988). Only then can he "challenge the admissibility of evidence on fourth amendment grounds." United States v. Gómez, 770 F.2d 251, 253 (1st Cir.

---

[6] In its order, the district court noted that Stokes "[sought] to suppress evidence (the contents of unopened mail) that the government has committed not to offer at trial." At oral argument, the Government acknowledged that it had intended to offer all mail addressed to trade associations, unopened and opened, should Stokes have proceeded to trial.

[7] "While the Supreme Court noted that this threshold analysis is 'more properly placed within the purview of substantive Fourth Amendment law than within that of standing,' Minnesota v. Carter, 525 U.S. 83, 88 (1998), courts continue to refer to it as an issue of 'standing.'" United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (citations omitted).

1985). "This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing." Aguirre, 839 F.2d at 856.

Here, there are three general categories of claims regarding the searches and seizures: the search of the Brockton P.O. Box; the seizure of envelopes from the Brockton P.O. Box as well as those withheld from delivery at the Willard Street and Blaine Street addresses; and the 8 envelopes addressed directly to Stokes. We evaluate each category in turn.

## 1. The Search of the P.O. Box

Stokes asserts that the search of his P.O. Box was unreasonable under the Fourth Amendment. This court has yet to decide whether a defendant can hold a reasonable expectation of privacy in a rented mailbox in circumstances like those here. See United States v. Burnette, 375 F.3d 10, 17 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1181 (2005). Nevertheless, we explained that

> the reasonableness of [the defendant's] asserted expectation of privacy may depend upon facts such as the layout of the mailroom and mailboxes, the [commercial mail receiving agency's ("CMRA")] procedures for mail delivery and storage, and the agreement between the CMRAs and their clients as to access by CMRA managers and third parties to mail inside the mailboxes.

Id. Stokes provided no information as to any of these factors before the district court or in his briefs to us. Stokes suggests

-9-

that his having a key to the P.O. Box creates a reasonable expectation of privacy as it demonstrates his exclusive access to the box.  At oral argument, however, he conceded that he did not have any information about the accessibility of the box to post office workers or any other details as to the layout of the mailroom.  Nor has he "offered [a] legitimate explanation or excuse for his failure to present evidence" on this front.  Gómez, 770 F.2d at 253.  Accordingly, Stokes has failed to carry his burden of proving that he has a legitimate expectation of privacy in the Brockton P.O. Box.

**2.  The Seizure of Letters Not Addressed to Stokes**

Next, Stokes asserts a privacy interest in the seizure of mail addressed to his P.O. Box, the Willard Street address, and the Blaine Street address.  "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy . . . ."  United States v. Jacobsen, 466 U.S. 109, 114 (1984); accord Ex Parte Jackson, 96 U.S. 727, 733 (1877).  Yet a defendant "has no reasonable expectation of privacy in the outside of mail that is sorted or stored" in a public area.  Burnette, 375 F.3d at 16-17.  Further, many of the federal courts of appeals have been reluctant to find that a defendant holds a reasonable expectation of privacy in mail where he is listed as neither the sender nor the recipient, at

-10-

least absent some showing by the defendant of a connection, and here Stokes has shown none.  See United States v. Smith, 39 F.3d 1143, 1145 (11th Cir. 1994) (holding no legitimate expectation of privacy where the defendant "was neither the sender nor the addressee of the letter"); United States v. Koenig, 856 F.2d 843, 846 (7th Cir. 1988) ("Because Graf was neither the sender nor the addressee of the package and thus has no privacy right in it, he therefore has no standing to make [a suppression] request."); United States v. Osunegbu, 822 F.2d 472, 480 n.23 (5th Cir. 1987) (finding that defendants "have no standing to challenge the actions of the postal inspectors" where the seized mail "was addressed to and intended for someone other than the" defendants); United States v. Givens, 733 F.2d 339, 342 (4th Cir. 1984) (per curiam) (finding that "defendants' status as intended recipient of the cocaine conferred upon them no legitimate expectation of privacy in the contents of a package addressed to another"); see also United States v. Lewis, 738 F.2d 916, 919-20 & n.2 (8th Cir. 1984) (assuming, without deciding, that the opening of a bill addressed to someone other than the defendant "cannot be said to have infringed his reasonable privacy expectations" (emphasis in the original)).

We need not decide whether a defendant ever could have a reasonable privacy interest in mail where he is not listed as

addressee or addressor.[8]  Stokes's affidavit, submitted in support

of his motion to suppress, asserts that the "USPS had no right to

seize, open and view my mail coming to me" at the P.O. Box, Blaine

Street address, and Willard Street address.  As an initial matter,

we query to what extent a blanket assertion that Stokes has a

privacy interest in "my mail coming to me" includes mail containing

no indication that it is associated with him.  Even then, Stokes's

barebones assertion does not touch on any of the factors that we

have listed as relevant to the standing inquiry, including

> ownership, possession and/or control; historical use
> of the property searched or the thing seized; ability
> to regulate access; the totality of the surrounding
> circumstances; the existence or nonexistence of a
> subjective anticipation of privacy; and the
> objective reasonableness of such an expectancy under
> the facts of a given case.

Aguirre, 839 F.2d at 856-57.

Stokes argues that he has Fourth Amendment standing by

virtue of some of the envelopes bearing his "personal addresses"

---

[8]  Lower courts in this circuit have recognized a privacy interest
in mail not addressed to or sent by the defendant where the
defendant carefully entrusted the mail to an intended recipient in
a bailment agreement, see United States v. Bates, 100 F. Supp. 3d
77, 84 (D. Mass. 2015), and where the defendant asserted that the
mail and its contents were intended for him as his property, see
United States v. Allen, 741 F. Supp. 15, 16-18 (D. Me. 1990).
Stokes does not argue that those scenarios are applicable here,
and we do not address the question of whether a defendant in these
situations could assert a reasonable expectation of privacy in the
searched mail.

of Willard Street and Blaine Street.[9]  Stokes provides little support for his contention that an address alone can create a reasonable expectation of privacy in a parcel.  Even if we were to accept this argument, he offers minimal information as to the nature of these addresses.  A review of the record reveals that the Willard Street address corresponds to a mail-handling service and the Blaine Street address to a property purchased by Stokes in 2006.  We do not know whether anyone else had access to these locations, what the nature of the delivery receptacle was, or any other information that could shed light on the reasonableness of his privacy interest.  See id. at 857 ("The most intimate of documents, if left strewn about the most public of places, would surely not be shielded.").  Without more, Stokes cannot shoulder his burden of demonstrating that he has a reasonable expectation of privacy in envelopes where he is not listed as an addressor or an addressee.

### 3.  The Seizure of Letters Addressed to Stokes

The Government acknowledges that it seized 8 pieces of mail addressed to Stokes, but it asserts that it has never opened this mail and did not intend to offer it as evidence at trial.

---

[9]  The mail addressed to these locations was seized before arrival. Accordingly, Stokes does not assert that there was an unconstitutional search of either property.

The lower court credited this account. Stokes, to the contrary, asserts that the Government opened his mail and that phone records he received from Sprint in January 2012 and February 2012 were used in the investigation. We review this factual finding for clear error. United States v. Ryan, 731 F.3d 66, 68 (1st Cir. 2013).

To support its contention that the mail was never opened, the Government submitted an affidavit detailing where the mail is being held and photocopies of the 8 seized envelopes. In the images, none of the envelopes appear to be opened or otherwise tampered with. Stokes asserts that "itemized portions of [the Sprint] bills are missing," but fails to identify any evidentiary support for this contention, instead citing portions of the record that contain photocopied images of the sealed envelopes. He identifies no other materials to bolster his contention that the mail was opened. And in any event, the district court also credited the Government's representation that it was not going to offer the evidence at trial. Ultimately, Stokes's conclusory allegations are insufficient to overcome the district court's determination. We conclude that the district court did not clearly err in declining to credit Stokes's unsupported assertions. Cf. Aguirre, 839 F.2d at 857 & n.4.

## B. Loss Calculation

Section 2B1.1 of the United States Sentencing Guidelines provides for an increase in the offense level for losses exceeding $6,500 for basic economic offenses.  USSG § 2B1.1(b)(1).  The Guidelines define loss as the greater of "actual loss," which is "the reasonably foreseeable pecuniary harm that resulted from the offense," or "intended loss," which is "the pecuniary harm that the defendant purposely sought to inflict."  Id. § 2B1.1 cmt. n.3(A)(i)-(ii).  The district court must determine loss by a preponderance of the evidence.  United States v. Sharapka, 526 F.3d 58, 61 (1st Cir. 2008).  "We review the sentencing court's interpretation of the sentencing guidelines de novo and its determination of facts for clear error."  United States v. González-Vélez, 587 F.3d 494, 503 (1st Cir. 2009).  The district court "need only make a reasonable estimate of the loss," and the Guidelines encourage reviewing courts to give deference to the district court's determination in light of its "unique position to assess the evidence and estimate the loss based upon that evidence."  USSG § 2B1.1 cmt. n.3(C).

In its sentencing memorandum and during the sentencing hearing, the Government identified three general categories of evidence to supports its loss estimate of $400,000 to $1,000,000: (1) records from United Check Cashing from September 2009 to

-15-

February 2012 indicating that Stokes cashed at least $204,935 worth of checks; (2) the seized envelopes, which included 443 envelopes addressed to the ADA presumably containing checks of $575, 32 envelopes addressed to the NAM presumably containing checks of $575, 10 envelopes addressed to the APRA presumably containing checks of $585, and 14 envelopes addressed to the ATA presumably containing checks of $685, for a total of $288,565; and (3) documents showing that Stokes purchased lists containing more than 400,000 fax numbers from 2008 to 2012 and sent more than 15,000 invoices in early 2012.

Stokes disputes the reliability of these materials.[10] He notes inconsistencies in the United Check Cashing documents and identifies several checks listed therein that do not appear to be included in the fraud scheme, including 21 checks in varying amounts from the same maker. Stokes also disputes that all of the unopened envelopes contained checks, noting that several envelopes have return addresses from Stokes's sister, the New York Office of the Attorney General, and the Better Business Bureau. Presumably,

_____

[10] As a threshold matter, the Government contends that Stokes waived this argument by conceding that the loss determination was correct at the sentencing. Conversely, Stokes contends that comments from the district court led him to believe that he risked withdrawal of his plea if he did not agree with the Government's recommendation. Because the Government easily prevails on the merits, we do not reach this issue.

these senders would not be submitting membership dues to join trade organizations.

The Government acknowledged that the documents were not "entirely reliable," but emphasized that the information was generally consistent with Stokes's scheme. For example, many of the cashed checks noted in the United Cash Checking documents corresponded to the membership dues amounts in the invoices that Stokes sent businesses, and some checks were visible through the windows of the unopened envelopes. More importantly, as both the Government and the district court observed during the sentencing hearing, one need not accept that each document offered by the Government corresponded to Stokes's scheme to arrive at the loss determination employed here. Even if half of the approximately 500 envelopes sent to Stokes's three addresses did not contain checks, they still support a finding of 250 victims and a loss of nearly $150,000. Moreover, the seized envelopes account for only a single year in Stokes's 5-year scheme. The $150,000 figure also does not include the cashed checks and the thousands of sent invoices for which Stokes had yet to receive checks. Given the breadth and duration of Stokes's operation, the district court did not clearly err in its loss determination.

## III.

For the reasons stated herein, we affirm.

-17-