UNITED STATES of America,

v.

Gerald MATA–PEÑA, et al., Defendants.

Criminal No. 16–423 (ADC)

United States District Court, D. Puerto Rico.

Signed 02/10/2017

Philippe A. Mesa–Pabon, United States Attorney's Office, San Juan, PR, for United States of America.

## OPINION AND ORDER

AIDA M. DELGADO–COLÓN, Chief United States District Judge

By an Indictment, dated June 30, 2016, a grand jury has charged defendants Gerald Mata–Peña ("Mata") and Domingo Ramos–Hernández ("Ramos") with Possession of Cocaine with Intent to Distribute, 21 U.S.C. § 841(a)(1), and Possession of a Firearm in Furtherance of a Drug–Trafficking Crime, 18 U.S.C. § 924(c)(1)(A). **ECF No. 5** at 1–2. The grand jury also charged Ramos with Being an Illegal Alien in Possession of a Firearm and Ammunition, 18 U.S.C. § 922(g)(5)(A). *Id.* at 2–3. The charges stem from the traffic stop of a Toyota Tacoma truck in which Mata was the driver and Ramos, its owner, was the passenger. **ECF No. 1–1** at 1. During the traffic stop, a police officer searched the truck and found three cardboard boxes inside a black plastic trash bag, containing opaque packages with a total of about six kilograms of cocaine. *Id.* at 1–2. Later, the officer found, inside a bag in the truck, a .40–caliber pistol with two fully-loaded magazines. *Id.* at 2. Mata and Ramos have pleaded not guilty to the charges. **ECF Nos. 12, 13.**

On September 23, 2016, Mata moved the Court to suppress the physical evidence taken from the truck on the ground that the police had searched the truck in violation of the Fourth Amendment. **ECF No. 33.** Ramos has moved the Court to let him join Mata's motion, which the Court will allow him to do. **ECF No. 36.** The Government opposes suppression. **ECF No. 37.**

On November 21, 2016, the Court conducted a suppression hearing. At the start of the hearing, the Government challenged Mata's standing, under the Fourth Amendment, to contest the searches of Ramos's truck. The Government requested leave to file a supplemental brief on standing, which the Court granted. During the evidentiary part of the hearing, the Government presented only a single witness: the officer who had not only stopped the truck, but found and seized all of the physical evidence in the truck. Defendants did not present any witnesses, by contrast, relying instead on cross-examination of the Government's witness. On November 30, 2016, the Government filed its supplemental brief, arguing that Mata lacks standing because, although he was driving the truck, he was only its passenger for Fourth Amendment purposes. **ECF No. 53.** Mata and Ramos filed separate responses to the brief. **ECF Nos. 55, 56.**

Having considered all of the evidence in the record, the Court now finds that the police violated the Fourth Amendment by searching and seizing, without probable cause or a warrant, the only contraband in the truck that was allegedly in plain view. The Court finds further that all of the physical evidence from the truck warrants suppression as fruit of the poisonous tree. However, the Court will grant suppression only as to Ramos because only he has established his standing, under the Fourth

Amendment, to contest the police conduct. Because Mata has failed to establish his own standing, the evidence against him will not be suppressed.

## I. Evidence at the Suppression Hearing

Agent Nolbert Cortés–Gómez ("Agent Cortés"), badge number 31546, has been a member of the Puerto Rico Police Department ("PRPD") since 2004.[1] He has been assigned to the PRPD's Tactical Operations Division since 2010. Previously, he served in the PRPD's Drug Division for more than six years. As an officer in the Drug Division, Agent Cortés learned how to identify drugs, conduct field tests, and supervise undercover officers. He has participated in more than five hundred drug-related arrests, about three to four of which involved kilograms ("kilos") of cocaine. His training and experience have taught him that kilos of powder cocaine are usually packaged as compact rectangular cubes, wrapped in clear plastic, beige tape, and/or newspaper.

On June 28, 2016, at approximately 4:00 a.m., Agent Cortés and other Tactical Operations Division members reported to the PRPD Academy in Gurabo, Puerto Rico, for a physical exam. At approximately 10:00 a.m., once the exams were over, the officers started to drive back to their stationhouse in Mayagüez, Puerto Rico, on the other side of the island, in a caravan of marked police vehicles. At approximately 11:30 a.m., near the 53.9–kilometer marker on Highway 52, Agent Cortés, who was driving the vehicle at the head of the caravan, saw a burgundy Toyota Tacoma truck make an illegal lane change—that is, change lanes without properly signaling in violation of P.R. Laws Ann. tit. 9, § 5156. Agent Cortés activated his vehicle's lights

---

1. The Court shall summarize Agent Cortés's hearing testimony, without crediting it. As explained below, even if the testimony were credited in full, the police conduct described therein violated the Fourth Amendment.

and sirens, and pulled the truck over. The other police vehicles in the caravan pulled over as well.

Agent Cortés's passenger, Sergeant Nuñez, proceeded to the front driver's-side window of the truck, while Cortés went to its front passenger's-side window. Both windows were rolled down. Mata was driving the truck, while Ramos, its owner, was sitting in the front passenger's seat. While Sergeant Nuñez spoke to Mata, Agent Cortés saw, through the open passenger's window, a tall black plastic garbage bag, with an open cardboard box sticking out of its top, in the middle of the rear seat of the truck. Protruding out of the box was an unzipped CD binder, normally used to store CDs in pages of sleeves, which had what appeared to be a rectangular package, wrapped in opaque newspaper, peering out of its near side by a few inches. The binder was resting on the open flap of the box. Agent Cortés's view of the package was unobstructed. In light of his training and experience, he thought that the package looked like a kilo of cocaine.

Based on an in-court demonstration of what the exposed package looked like—using the actual boxes, binders, newspapers, and kilos of cocaine that the police found in the truck—Agent Cortés could see, at most, only a few inches of one of its short and narrow sides sticking out of the otherwise closed edge of the CD binder.[2] Because its wrapping was opaque, the package's contents were not visible. Agent Cortés, acting upon his own initiative and without consulting anyone or receiving the

passenger's consent, opened the rear passenger's-side door of the truck, removed the wrapped package from the CD binder, tore the newspaper off of the package, and uncovered a compact rectangular cube of white power, wrapped in clear plastic, that he believed to be kilo of cocaine.[3] Agent Cortés informed Sergeant Nuñez about what he had found, and the officers then placed Mata and Ramos under arrest.

Agent Cortés now saw that the CD binder contained, behind the package he had just removed, a second rectangular package, wrapped in opaque newspaper. Unlike the exposed package, which had one of its short sides pointing towards the bottom of its binder, the second package had one of its long sides pointing towards it. Agent Cortés then removed the second package from the binder, tore off its wrapping, and discovered a second kilo of cocaine. Inside the black plastic garbage bag on the rear seat of the truck were two more cardboard boxes, sealed with tape. The boxes were stacked vertically within the garbage bag, one on top of the other.

Agent Cortés removed the two closed boxes from the bag, tore off their tape, and opened them. Buried in the middle of each box, which were filled with foam and newspaper (amongst other padding), was another binder, except these were both zippered shut. So, Agent Cortés unzipped the binders, opened them, and found, in each binder, two more rectangular packages, wrapped in opaque newspaper. Like the second package in the exposed binder,

2. During the demonstration, Agent Cortés was allowed to recreate, to his satisfaction, the way in which the package and binder were allegedly exposed to public view by resting on the open flap of the cardboard box. But the open flap of the box kept lifting up, obscuring the wrapped package from view, presumably because the package and binder were not heavy enough to weigh it down. So, Agent Cortés had to repeatedly bend the flap

back down to make the package more visible. The Court has assumed that Cortés had the best possible view of it.

3. At some point, the powder was field tested and tested positive for cocaine. For the sake of convenience, the Court will refer to each rectangular cube of white powder that the police recovered as a kilo of cocaine.

these packages were positioned with their long sides running parallel to the short ends of their binder—i.e., horizontally or in "landscape" mode—thereby allowing two packages to fit in each binder when zipped shut. The officers then transported the defendants, the evidence, and Ramos's truck to a stationhouse in Salinas, Puerto Rico, located about ten minutes away.

At the stationhouse, Agent Cortés unwrapped the four packages he had found inside the closed CD binders, which in turn he had found inside the closed cardboard boxes, which in turn he had found in the black plastic garbage bag on the rear seat of the truck. Upon opening each package, Agent Cortés discovered a new kilo of cocaine, for a total of six kilos. Approximately thirty to forty-five minutes after the arrest, Agent Cortés conducted, in the parking lot of the stationhouse, an "inventory search" of the truck, following a PRPD form and procedure. During the search, which he performed in front of defendants, Agent Cortés took a black bag, which he called a "man purse," from the floor of the truck's front passenger's seat. Inside the bag, Agent Cortés found a .40–caliber Taurus PT140 pistol, with two fully-loaded ten-round magazines and $1,113 in cash. At the time of this "inventory search," Agent Cortés did not believe that either defendant posed any threat of harm or evidence destruction. At some point, at the stationhouse, Agent Cortés asserts he issued Mata a traffic ticket for his illegal lane change. However, at the hearing, Agent Cortés did not recall either when or exactly where he had issued the ticket.[4]

Agent Cortés's above searches and seizures did not occur pursuant to a warrant or with the consent of Mata or Ramos.

## II. Legal Standards under the Fourth Amendment for Searches and Seizures

The Fourth Amendment "protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *City of Los Angeles* v. *Patel*, —— U.S. ——, 135 S.Ct. 2443, 2452, 192 L.Ed.2d 435 (2015) (alteration in original) (quoting U.S. Const. amend. IV). "It further provides that 'no Warrants shall issue, but upon probable cause.'" *Id.* (quoting U.S. Const. amend. IV). The Supreme Court "has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Id.* (alterations in original) (quoting *Arizona* v. *Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)). The Government has invoked only the automobile and plain-view exceptions to justify the warrantless search and seizure that led the police to recover the initial, exposed kilo of cocaine. *See* **ECF No. 37** at 6–8.

 "Under the automobile exception, . . . 'police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.'" *United States* v. *White*, 804 F.3d 132, 136 (1st Cir. 2015) (quoting *United States* v. *Silva*, 742 F.3d 1, 7 (1st Cir. 2014)). Pursu-

---

4. At the hearing defendants introduced a certified document, from September 2016, indicating that Mata had not received a traffic ticket in Puerto Rico in the last three years. In cross examination the government suggested that, presumably because the Puerto Rico Transportation Department usually has backlogs, Mata might have pending tickets that had not yet been processed. However, the Government did not introduce into evidence a copy of the ticket, nor any record of its issuance.

ant to that exception, the police may search not only "every part of the vehicle," but also "its contents, including all containers and packages, that may conceal the object of the search." *United States* v. *Santana*, 895 F.2d 850, 852 (1st Cir. 1990) (citing *United States* v. *Ross*, 456 U.S. 798, 820–24, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)); *see also United States* v. *López*, 380 F.3d 538, 544–45 (1st Cir. 2004) (quoting *California* v. *Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)). Another "exception" to the warrant requirement "is for items in plain view." *United States* v. *Paneto*, 661 F.3d 709, 713 (1st Cir. 2011). "A police officer, even though he does not have a search warrant, may seize an object in plain view as long as he has lawfully reached the vantage point from which he sees the object, has probable cause to support his seizure of that object, and has a right of access to the object itself." *Id.* (citing *United States* v. *Sánchez*, 612 F.3d 1, 4–5 (1st Cir. 2010)). "When an officer seeks to manipulate an object in plain sight, the relevant inquiry becomes whether 'the "plain view" doctrine would have sustained a seizure of the [object itself].' " *Id.* at 713–14 (alteration in original) (quoting *Arizona* v. *Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)).

▮ "In general terms, probable cause exists when police have sufficient reason to believe that they have come across evidence of a crime." *Id.* at 714 (citing *Texas* v. *Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). In the 'plain view' context, "probable cause exists when the incriminating character of [the] object is immediately apparent to the police." *Id.* (alteration in original) (quoting *Sánchez*, 612 F.3d at 5). "The officer need not be certain of the incriminating character of [the] object, but, rather, must have a belief based on a 'practical, non-technical probability' that the object is evidence of a crime." *Id.* (quoting *United States* v. *Gian-*

*netta*, 909 F.2d 571, 579 (1st Cir. 1990)). In assessing probable cause, courts "apply an objective test, asking whether the facts constitute probable cause of a crime, rather than whether the officer thought they did." *United States* v. *Monell*, 801 F.3d 34, 40 (1st Cir. 2015) (citing *Silva*, 742 F.3d at 8).

▮ The federal "prohibition on unreasonable searches and seizures is enforced through the exclusionary rule, which excludes evidence seized in violation of the Fourth Amendment." *United States* v. *Camacho*, 661 F.3d 718, 724 (1st Cir. 2011) (citing *Terry* v. *Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Where evidence is not obtained as the direct result of an illegal search, but may have been derived from the fruits of that initial search, [courts] must determine 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality.' " *García–Aguilar* v. *Lynch*, 806 F.3d 671, 675 (1st Cir. 2015) (quoting *United States* v. *Crews*, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)).

▮ "Exclusion is not an automatic consequence of a Fourth Amendment violation, but rather is available only where the benefits of deterring the police misconduct that produced the violation outweigh the costs of excluding relevant evidence." *United States* v. *Thomas*, 736 F.3d 54, 60 (1st Cir. 2013) (citing *Herring* v. *United States*, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)). Because "the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment," it is "proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *United States* v. *Sym-*

*onevich*, 688 F.3d 12, 19–20 (1st Cir. 2012) (quoting *Rakas* v. *Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Accordingly, courts "regularly decline[ ] to extend the benefits of the exclusionary rule to defendants whose personal Fourth Amendment rights have not been infringed upon." *Id.* at 20 (citing *Minnesota* v. *Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)).

■■■■■■ "The 'capacity to claim the protection of the Fourth Amendment depends … upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy.'" *United States* v. *Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (ellipsis in original) (quoting *Rakas*, 439 U.S. at 143, 99 S.Ct. 421). "Under what is known as the 'standing' doctrine, the defendant carries the burden of making a threshold showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized.'" *Id.* (quoting *United States* v. *Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988)). "Only then can he 'challenge the admissibility of evidence on fourth amendment grounds.'" *Id.* (quoting *United States* v. *Gómez*, 770 F.2d 251, 253 (1st Cir. 1985)). "This burden must be carried at the time of the pretrial hearing and on the record compiled at that hearing." *Id.* (quoting *Aguirre*, 839 F.2d at 856).

## III. Analysis of the Search and Seizure Leading to the Initial Recovery of Cocaine

■■■■ The only credibility determinations that the Court will make at this juncture is that Agent Cortés did, indeed, observe Mata change lanes illegally, in violation of P.R. Laws Ann. tit. 9, § 5156, thereby authorizing the police to stop the truck that Mata was driving. *See United States* v. *Andrade*, 94 F.3d 9, 10 (1st Cir. 1996) (holding that "a traffic violation" gives the police probable cause to stop a vehicle, even if it "was only a pretext to search the car in hope of proving more serious charges") (citing *Whren* v. *United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). The Court also credits Agent Cortés that his demonstration at the hearing—in which he recreated, for the Court, what he says he saw in plain view before conducting the initial search and seizure, using the actual evidence that he had found in the truck—fairly and accurately represented what he allegedly saw in plain view. But, absent a need to do so, the Court will not decide whether the allegations themselves are credible. The Court is declining to make further credibility determinations because, even if Agent Cortés's testimony were credited in full (which the Court is not conclusively deciding), the search and seizure that led him to find the first kilo of cocaine—the only contraband allegedly in plain view—violated the Fourth Amendment. As the Court will explain, the record fails to support, as a matter of law, that Agent Cortés had probable cause that the rectangular sliver of newspaper-wrapped package he allegedly saw in plain view was part of a larger book-shaped package that not only was the same size and shape as a kilo of cocaine, but actually was a kilo of cocaine. The Government responds that the search and seizure leading to the discovery of that first kilo were justified because, "[w]hile conducting [a] traffic stop, Agent Cortés was able to see in plain view a brick object which, according to his training and experience as a police officer and former narcotics agent, was consistent with the way and form in which a kilogram of controlled substances is packaged." **ECF No. 37** at 8. However, that argument is meritless.

Because the Court is declining to make further credibility determinations, absent a need to do so, the Court accepts, for present purposes, that, upon lawfully stopping the truck, Agent Cortés saw a few newspa-

per-wrapped inches of one side of what appeared to be a rectangular package, sticking out of an unzipped, but otherwise closed, CD binder, sticking out of an open cardboard box, sticking out of an open black plastic garbage bag on the rear seat of the truck. The Court's version of these facts is based not only upon Agent Cortés's hearing testimony, but upon his in-court demonstration during which he recreated, for the Court, the partially-exposed package that he claims to have seen in plain view, which, he further claims, gave him adequate cause to search and seize the package. The Court has interpreted Agent Cortés's testimony in light of this demonstration because, as has often been observed, "a picture speaks a thousand words." *See Bielunas* v. *F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010).

Since the Court has declined to make additional credibility determinations, the Court will simply note that it was mightily convenient for the police that, although someone had evidently taken the precaution of hiding the kilos of cocaine—by enclosing them in an opaque wrapping of newspaper, then placing them in a zippered-shut CD binder, then tucking the binder into a well-padded cardboard box, then camouflaging the boxes in a large black trash bag—virtually all of that protective packaging was then undone, as to a single wrapped kilo of cocaine, thereby exposing part of the kilo to the plain view of a police officer, who had fortuitously decided to interrupt an entire caravan of police vehicles, in the middle of their hours-long drive across the island, to investigate a traffic infraction that is exceedingly common in this jurisdiction. Based on the Court's own experiences on the roads of Puerto Rico, the officers must have seen dozens illegal lane changes during their drive back to Mayagüez. But Agent Cortés stopped only this particular vehicle, without any explanation as to why he chose, apparently spontaneously, to act as a traffic enforcer here. It was, it turns out, an exceptionally lucky choice.

Finally, the Court observes that the black plastic bag had been torn apart, that the duct tape previously sealing the cardboard was pulled back and still affixed to its sides and that the package that was allegedly in plain view had its short side sticking out of the short end of its binder. Meanwhile, all the other packages had their long sides running parallel to the short ends of their binder. The Court finds it interesting that the only package that was allegedly in plain view was positioned so differently, within its binder, than all the other packages. If anything, the tearing up of the black plastic bag and the careless positioning of the exposed package seemed to suggest that someone had quickly opened up the garbage bag, and then the cardboard box, and then the CD binder, to check what was inside them. But Agent Cortés did not mention any apparent tampering with the newspaper wrapping of the exposed package, until, of course, he removed it as part of his warrantless search. Again, all mightily convenient for the police.

Even accepting Agent Cortés's facts as true, the record does not support the bold claim that "the incriminating character of [the partially-exposed package was] immediately apparent to [him]." *Paneto*, 661 F.3d at 714 (quoting *Sánchez*, 612 F.3d at 5). The Court is aware that Agent Cortés did not need to be "certain of the incriminating character of [the package], but, rather, must have [had] a belief based on a 'practical, non-technical probability' that the [package was] evidence of a crime." *Id.* (quoting *Giannetta*, 909 F.2d at 579). However, the only basis that Agent Cortés gave for his belief that the package contained drugs was his unspecified training at some point between 2004 and 2010 and his experience in maybe four arrests in-

volving kilos of cocaine, which had allegedly taught him that kilos are usually packaged as compact rectangular cubes, wrapped in clear plastic, beige tape, or, as was the case here, newspaper. The record, in terms of both what Agent Cortés allegedly saw and what he allegedly knew through experience and training, is entirely too thin to support the requisite finding of probable cause. Thus, the Court finds that, as a matter of law, the record fails to support the actions that Agent Cortés took based on the observations he had allegedly made. *See United States* v. *Barrios–Moriera*, 872 F.2d 12, 17–18 (2d Cir. 1989) (indicating that the "mere viewing and evaluation" of a "rectangular package, measuring a certain size [resembling a kilo of cocaine], wrapped in duct tape," by a trained officer who "had participated in the seizure of three or four hundred separate kilos of cocaine" and learned that "a kilogram of cocaine [i]s typically wrapped in some variety of tape," did not give the officer "probable cause" to believe that the package contained drugs).

During the demonstration, the Court viewed the blandly rectangular, book-like shape of the recovered kilos of cocaine, as well as one of those kilos wrapped in the newspaper that had been used to camouflage them. Agent Cortés then placed the newspaper-wrapped kilo partially inside of an unzipped, but otherwise closed, CD binder, which he then placed partially inside of an open cardboard box, all of which had been taken from the truck. Agent Cortés stated that what the Court was viewing constituted a fair and accurate representation of what he had seen prior to searching and seizing the exposed package. And, the small portion of the package that was exposed to plain view—only a few inches of one of its sides—simply looked like part of a possibly book-shaped object, wrapped in newspaper. The closed flaps of the unzipped CD binder obscured the true shape and size of the package from view,

especially the angle from which Agent Cortés would have seen it, standing outside of the tall truck. Actually, during the demonstration, Agent Cortés struggled with the open flap of the cardboard box, upon which he had allegedly seen the exposed package, and its binder, resting. He repeatedly had to bend and press the open flap down, to help make the edge of the partially-exposed package more visible. Apparently, the weight of the package and binder, on their own, did not suffice.

The chambers of this Court are filled with lawful goods that, if encased in newspaper, would look indistinguishable from the exposed package. Unlike the small balloons, glassines, and tinfoil packets that not only are staples of the drug trade, but are infrequently used to package legal goods, the specific newspaper-wrapped package at issue here had a perfectly common shape, size, and appearance. Yet, based on his testimony, Agent Cortés relied upon only the appearance of the exposed portion of the package to determine that he had probable cause to search and seize the package without a warrant.

The Government does not point to any pre-seizure circumstances that indicated that it was probable that the wrapped package contained narcotics, as opposed to a lawful object—say, a book or a small collection of CDs or DVDs—of the same common shape and size. Nor did the Government elicit any testimony that indicated that the mode of transporting the newspaper-wrapped package—in a CD binder, in a cardboard box, in a large black trash bag, in a truck, on that highway—was itself suspicious. Instead, the Government only asserts that Agent Cortés could search and seize the partially-exposed package since he "was able to see [it] in plain view" and, "according to his training and experience ..., [it] was consistent with the way and form in which a kilogram

of controlled substances is packaged." [5] **ECF No. 37** at 8; *see also id.* at 2 (stating that Agent Cortés's mere observation of a "squared object," wrapped in newspaper, "similar to the shape of a brick of drugs" was, in itself, sufficient to give him cause to search and seize).

The Court knows that "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States* v. *Cardona–Vicente,* 817 F.3d 823, 828 (1st Cir. 2016) (quoting *United States* v. *Young,* 105 F.3d 1, 7 (1st Cir. 1997)). But the Government's argument is far too broad because it implies that a trained officer, upon being credited that he knows that kilos of drugs are often packaged in newspaper, may then seize any newspaper-wrapped package of a similar shape and size. The universe of closed packages that are "consistent with" the panoply of ways in which drugs are packaged is expansive and ever-expanding, reaching far beyond the wrapped book-shaped package at issue here. Moreover, unlike the beige tape and clear plastic that Agent Cortés testified are also used to wrap narcotics, newspaper is not naturally connected to the transportation of illegal substances for the simple reason that newspaper does not mask scents. *Cf. United States* v. *$242,484.00,*

389 F.3d 1149, 1162 (11th Cir. 2004) (en banc) ("Cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs") (quoting *United States* v. *$42,500.00,* 283 F.3d 977, 982 (9th Cir. 2002)); *United States* v. *Hernández,* 313 F.3d 1206, 1211 (9th Cir. 2002) ("traffickers often tape the seams of drug packages in order to conceal the scent of the contraband"). And, the Government has compounded this concern by failing to offer any way to cabin its logic if, for example, drug traffickers began to package kilos of cocaine in gift-wrapping paper. The Court will not endorse a view of the Fourth Amendment that would allow trained police officers to arrest and seize the packages of anyone who walks out of a bookstore with a wrapped gift of the right size.

In any event, the Government's argument is ill-suited to this case because Agent Cortés only viewed the true size and shape of the exposed package after having seized it, by pulling all of it, as opposed to only a small part of it, into plain view. Thus, the Government may not claim that it was the similarity between the shape of the package and that of a kilo of cocaine that gave the officer probable cause, under the plain-view exception, to seize the package. *See Hicks,* 480 U.S. at 324–26, 107

5. The Government also mentions that the police may stop and frisk suspects for a weapon upon reasonable suspicion that they are armed and dangerous. *See* **ECF No. 37** at 3–4. The Government tries to use that rule to argue that the search and seizure of the package in plain view was justified by reasonable suspicion. *See id.* at 5–6. That argument is mistaken. *Arizona* v. *Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (holding that to invoke the plain-view exception, probable cause, not reasonable suspicion, is required); *cf. Terry* v. *Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that pat-downs justified by reasonable suspicion "must be limited to that which is necessary for the discovery of weapons which

might be used to harm the officer or others nearby"); *United States* v. *Schiavo,* 29 F.3d 6, 9 (1st Cir. 1994) (holding that *Terry* pat-downs are limited to a search for weapons, not drugs). Insofar as the Government seeks to justify Agent Cortés's warrantless searches for drugs as protective searches for weapons, *see* **ECF No. 37** at 8 (arguing that post-arrest searches of "the boxes in the rear seat of the [truck was justified] to ensure the safety of intervening officers"), the Government has waived that argument for lack of legal and factual development. *See United States* v. *Ross,* 837 F.3d 85, 89 n.2 (1st Cir. 2016) (citing *United States* v. *Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)).

S.Ct. 1149 (seizure of equipment not justified by the plain-view exception, where the police first needed to move the equipment to acquire enough information to have probable cause that it was stolen). And, by "moving" the whole package into plain view before he had probable cause to seize it, Agent Cortés also searched the package without sufficient cause to do so. *Id.* at 324–25, 107 S.Ct. 1149; *see also Paneto,* 661 F.3d at 713–14.

Although the shape and packaging of narcotics can sometimes be sufficiently distinctive to create probable cause when viewed by a trained eye, there was nothing distinctive about the small piece of wrapped package allegedly in plain view here that rendered it probable that its contents was drugs. *See Barrios–Moriera,* 872 F.2d at 17–18; *cf. Brown,* 460 U.S. at 733–34, 742–43, 103 S.Ct. 1535 (plurality op.) (finding that an officer had probable cause that an "opaque, green party balloon, knotted about one-half inch from the tip" contained drugs because "the distinctive character of the balloon itself spoke volumes as to its contents—particularly to the trained eye of the officer," and the officer "was able to observe the contents of the glove compartment of [the defendant's] car, which revealed further suggestions that [he] was engaged in . . . possession of illicit substances."). Because Agent Cortés did not observe any corroborating indicia of the presence of narcotics in the truck, and because the small sliver of exposed package that he could see could not have given him more than a hunch about its contents, the Fourth Amendment forbade him from searching and seizing the package without a warrant. *See Paneto,* 661 F.3d at 713–14.

## IV. Application of the Exclusionary Rule to Suppress the Physical Evidence

The Court must now determine whether the fruits of that Fourth Amendment violation ought to be suppressed as to any defendant whose rights were violated. The Court recognizes that "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis* v. *United States,* 564 U.S. 229, 236, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (quoting *Stone* v. *Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)). Rather, the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Id.* at 236–37, 131 S.Ct. 2419 (citing *Herring* v. *United States,* 555 U.S. 135, 141 & n.2, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)). The Court further recognizes that the rule's operation is "limited . . . to situations in which this purpose is 'thought most efficaciously served.'" *Id.* at 237, 131 S.Ct. 2419 (quoting *United States* v. *Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). Exclusion imposes heavy social costs, and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (citing *Herring,* 555 U.S. at 141, 129 S.Ct. 695). Thus, "exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred." *Id.* at 244, 131 S.Ct. 2419 (citing *Arizona* v. *Evans,* 514 U.S. 1, 13–14, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)).

"When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 238, 131 S.Ct. 2419 (quoting *Herring,* 555 U.S. at 144, 129 S.Ct. 695). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its

force,' and exclusion cannot 'pay its way.' " *Id.* (internal quotation marks omitted) (quoting *United States* v. *Leon*, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); then quoting *Herring*, 555 U.S. at 137, 129 S.Ct. 695; then quoting *Leon*, 468 U.S. at 919, 908 n.6, 104 S.Ct. 3405). However, to fall under this so-called good-faith exception, the negligent conduct must not only be "isolated" and "attenuated" from the discovery of the evidence, it must also be based on an " 'objectively reasonable reliance' " on apparent facts that would have justified the conduct. *Herring*, 555 U.S. at 137, 142, 129 S.Ct. 695 (quoting *Leon*, 468 U.S. at 922, 104 S.Ct. 3405). In other words, the " 'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.' " *Id.* at 145, 129 S.Ct. 695 (quoting *Leon*, 468 U.S. at 922 & n.23, 104 S.Ct. 3405). For that reason, "the good-faith exception has not generally been applied to warrantless searches." *United States* v. *Ramírez–Rivera*, 800 F.3d 1, 32 n.25 (1st Cir. 2015) (citing *Davis*, 564 U.S. at 257–58, 131 S.Ct. 2419 (Breyer, J., dissenting)); *see also* 1 Wayne R. LaFave, Search and Seizure § 1.3(g) (5th ed. 2016). After all, an officer may not excuse his ignorance of Fourth Amendment law by relying, in good faith, on his ignorance.

■ The Court finds that the warrantless search and seizure, without probable cause, of the wrapped package that was minimally in plain view merits the suppression of the kilos of cocaine that Agent Cortés discovered as a direct result of those illegal acts. Agent Cortés's own account of his acts made it clear that he had flagrantly violated the Fourth Amendment in his otherwise commendable zeal to find narcotics in the truck. Moreover, the Court finds that the taint of that initial illegality has poisoned the searches and seizures that then led to the recovery of the other physical evidence from the truck, including the other kilos of cocaine and also the handgun and ammunition. *See United States* v. *Cordero–Rosario*, 786 F.3d 64, 75–76 (1st Cir. 2015).

The record shows that the police found the other evidence only "by exploitation" of the illegality that had led to the discovery of the first kilo of cocaine. *Id.* at 76 (quoting *Wong Sun* v. *United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). After all, no attenuating facts or circumstances, beyond the passage of inconsequential time, intervened between the illegality and the later searches and seizures to dissipate the taint. The only reason why Agent Cortés conducted, at the scene of the traffic stop, the searches and seizures that led to the discovery of the five packages that were not in plain view was because he had just illegally searched and seized the package in plain view, finding the kilo of cocaine that gave him probable cause to arrest defendants. *See* ECF No. 37 at 1–2, 6, 8 (Government's account of facts). Although the pistol and bullets were found pursuant to an alleged inventory search of the truck, at most forty-five minutes after the arrest, those items were still fruits of the poisonous tree.[6] *See United States* v. *Streifel*, 781 F.2d 953, 956 (1st Cir. 1986) (holding that evidence found in inventory search of car warranted suppression because car had been impounded pursuant to an unlawful arrest). In any event, although the Govern-

---

6. The Court can only call the search an "alleged inventory search" because the Government barely elicited any evidence about the procedures that a PRPD officer must follow in, say, opening closed bags in an impounded vehicle pursuant to an inventory search. In fact, the only evidence that the Government adduced was that some procedures exist, that Agent Cortés claimed to have followed them, and that a form was filled out for the search.

ment bears the burden of proving attenuation, *see United States* v. *Kornegay,* 410 F.3d 89, 94 n.3 (1st Cir. 2005), the Government has neither argued attenuation, nor developed a factual record that might prove attenuation, and, thus, has waived the argument, *see United States* v. *Ross,* 837 F.3d 85, 89 n.2 (1st Cir. 2016) (citing *United States* v. *Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)).

 In its supplemental brief, filed after Agent Cortés testified at the suppression hearing, the Government argues for the first time that "[e]ven if ... a Fourth Amendment violation occurred, this Court should deny the motion to suppress in its entirety as no police officer acted in bad faith." **ECF No. 53** at 4. The Government compresses the factual basis for its argument into a single sentence: "The Government respectfully submits that Agent Nolbert Cortés' testimony established that he acted in good faith at all times." *Id.* at 5. How did his testimony establish it? The Government does not say. Perhaps the Government meant to refer to the fact that, when he testified at the hearing, Agent Cortés appeared to be blissfully unaware that one could raise valid constitutional objections to his conduct. Indeed, based on his complacent demeanor while testifying and the breathtaking fact that the Government initially proffered his testimony as proof of his perfect compliance with the Fourth Amendment, *see* **ECF No. 37,** the Court suspects that neither supervisor, nor fellow agent, nor prosecutor had earlier expressed any concern to him about his flagrant Fourth Amendment violations, which is, truthfully, the most worrisome fact of all. The Court finds that the good-faith exception to the exclusionary rule cannot be used to excuse the warrantless searches and seizures at issue here, as to which any adequately trained officer would have realized that he lacked probable cause or constitutional justification. *See Herring,* 555 U.S. at 137, 142, 145, 129

S.Ct. 695; *see also Ramírez–Rivera,* 800 F.3d at 32 n.25. As the Court stated above, an officer may not rely in good faith on his own ignorance of Fourth Amendment law.

Accordingly, the Court finds that all of the evidence that the police found in the truck—including the cocaine, pistol, and magazines with bullets—warrants suppression. *See Cordero–Rosario,* 786 F.3d at 75. The Court does not make this ruling lightly because, in so many cases, the bottom-line effect of the exclusionary rule "is to suppress the truth and set the criminal loose in the community without punishment." *Davis,* 564 U.S. at 237, 131 S.Ct. 2419 (citing *Herring,* 555 U.S. at 141, 129 S.Ct. 695).

## V. Limitation of Suppression to Defendants with Fourth–Amendment Standing

However, suppression is only appropriate as to those defendants who had a reasonable expectation of privacy in the truck and its contents. *Stokes,* 829 F.3d at 51. As the uncontested owner and passenger of the truck, Ramos had a reasonable expectation of privacy in it and its contents; thus, he warrants suppression of the physical evidence against him due to the Fourth Amendment violations found above. *United States* v. *Almeida,* 748 F.3d 41, 47 (1st Cir. 2014).

 By contrast, Mata has failed to allege any interest in the truck or its contents, aside from his status as its "authorized driver," while Ramos, "the owner of the vehicle, ... was sitting next to [him]." **ECF No. 55,** ¶ 3. Under controlling precedent, the Court finds that Mata "has failed to meet his burden of proof establishing that he had a reasonable expectation of privacy in the truck." *Almeida,* 748 F.3d at 48 (applying *United States* v. *Sánchez,* 943 F.2d 110, 113–14 (1st Cir. 1991), and *United States* v. *Lochan,* 674 F.2d 960, 965 (1st

Cir. 1982)). At best, the record indicates that Mata "had 'only a casual possession' of the truck." *Id.* (quoting *Sanchez*, 943 F.3d at 113). "He did not own it, and he has shown no pattern of repeated use or control over the truck that would allow us to conclude that his possession of the truck was anything more than 'informal and temporary.' " *Id.* (quoting *Sánchez*, 943 F.3d at 114). While Mata asserts that he has standing because he had "control of the vehicle" at the time of the stop, *see* **ECF No. 55, ¶ 3**, "[t]here [i]s no evidence as to the responsibility or control [that he] had over the [truck] other than the fact that he was driving it when stopped," *Almeida*, 748 F.3d at 48 (quoting *Lochan*, 674 F.2d at 965). And, he "was driving the [truck] while the owner of the [truck] was in the passenger seat." *Id.* (citing *Lochan*, 674 F.2d at 965). Moreover, there is no evidence that Mata's casual possession of the truck lasted for more than a single "short trip" that, by necessity, took place entirely on this island. *See id.* (quoting *Lochan*, 674 F.2d at 965). Due to his failure to show that his interests in the truck and its contents were anything more than casual and temporary, Mata has not established his standing to contest the searches and seizures that led to the physical evidence. *Id.* Thus, the Court's suppression of the evidence will not extend to him. *See Symonevich*, 688 F.3d at 19–20.

## VI. Conclusion

In sum, the Court hereby **GRANTS** Ramos's motion to join Mata's suppression motion, **ECF No. 36.** The Court also **GRANTS** the suppression motion, **ECF No. 33,** having found that Agent Cortés's testimony, even if credited in full, shows that he flagrantly violated the Fourth Amendment in searching and seizing, with neither a warrant, nor probable cause, the wrapped package partially in plain view. Due to the taint of that illegality and a lack of attenuation, the Court **SUP-**

**PRESSES** all of the physical evidence that the police recovered from Ramos's truck, **BUT ONLY** as to Ramos because only he established his standing to contest the police conduct pursuant to the Fourth Amendment. Accordingly, the evidence is not suppressed as to Mata.

**SO ORDERED.**